UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CASEY ROWE                                    CIVIL ACTION

VERSUS                                        NO. 13-5545

SALLY JEWELL, SECRETARY, U.S.                 MAGISTRATE JUDGE
DEPARTMENT OF INTERIOR, BUREAU                JOSEPH C. WILKINSON, JR.
OF OCEAN ENERGY MANAGEMENT

## ORDER AND REASONS ON MOTIONS

In this employment discrimination action, plaintiff, Casey Rowe, alleges that his

employer, Sally Jewell, Secretary, U.S. Department of Interior, Bureau of Ocean Energy

Management (the "Bureau"), discriminated against him based on his gender when the

Bureau failed to select him for one of two job vacancies in March 2012; retaliated against

him for engaging in protected activity by giving him a "fully successful," rather than a

"superior" or "exceptional," performance rating for 2012; and created a retaliatory hostile

work environment, all in violation of Title VII.  42 § U.S.C. 2000e et seq.  Complaint,

Record Doc. No. 1.  This matter was referred to a United States Magistrate Judge for all

proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written

consent of all parties.  Record Doc. No. 15.

The Bureau filed a motion for summary judgment supported by several

declarations under penalty of perjury, a deposition transcript and verified documentary

exhibits.  Record Doc. No. 37.  Pretermitting any discussion of whether plaintiff can

establish a prima facie case of gender discrimination, the Bureau argues that Rowe

cannot rebut its proffered legitimate, non-discriminatory reasons for not selecting him for the vacancy because the evidence does not support his assertion that he was clearly better qualified than the successful applicants. As to his claim of a retaliatory hostile environment, defendant contends that Rowe's evidence fails to create any disputed fact issues on two of the four prongs of a prima facie case. Regarding plaintiff's contention that his supervisors retaliated against him by giving him a "fully successful" performance evaluation, the Bureau argues that he cannot establish the "causal link" element of a prima facie case or, alternatively, if he can establish a prima facie case, the evidence does not establish a material fact issue as to "but for" causation.

Rowe also filed his own motion for summary judgment, arguing that he is entitled to summary judgment on all of his claims. Record Doc. No. 31. His motion is supported by a memorandum that far exceeds the court's page limitations, without having sought leave to file excessive pages, and by an oppressive collection of extremely voluminous exhibits, many of which are duplicative and irrelevant. Plaintiff's exhibits include numerous entire deposition transcripts and transcripts of sworn statements taken by an investigator during the investigation of plaintiff's Equal Employment Opportunity ("EEO") complaints, when only portions are relevant or helpful; one declaration under penalty of perjury; and a paper mountain of largely unverified, miscellaneous and extraneous documents. However, the Bureau does not dispute the authenticity of any of Rowe's exhibits. Despite the excessiveness of plaintiff's submissions, the court has

laboriously reviewed all the materials and has considered them authentic and as evidence to the extent they are relevant and otherwise admissible.

After the motions for summary judgment were filed, the parties timely filed a joint statement of undisputed facts. Record Doc. Nos. 45, 46. Rowe and the Bureau each filed a timely memorandum in opposition to the other's summary judgment motion. Record Doc. Nos. 47, 48. Plaintiff received leave to file additional exhibits, an amended statement of undisputed facts and an amended memorandum in support of his motion. Record Doc. Nos. 38, 44, 49, 50, 51, 52. The court granted the Bureau's motion for relief from its obligation under Local Rule 56.2 to respond to Rowe's extremely lengthy statement of undisputed facts. The court therefore assumes that defendant disputes any facts in plaintiff's amended statement of uncontested facts that were not incorporated into the parties' joint statement of undisputed facts. Record Doc. Nos. 39, 51.

Having considered the complaint, the record, the submissions of the parties and the applicable law, and for the following reasons, IT IS ORDERED that defendant's motion for summary judgment is GRANTED and plaintiff's motion is DENIED.

I.    <u>STANDARDS OF REVIEW</u>

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

3

P. 56(a).  Rule 56, as revised effective December 1, 2010, establishes new procedures for

supporting factual positions:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in

the record that it believes demonstrate the absence of a genuinely disputed material fact,

but it is not required to negate elements of the nonmoving party's case.  Capitol Indem.

Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production

may rely on a showing that a party who does have the trial burden cannot produce

admissible evidence to carry its burden as to [a particular material] fact."   Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.   Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).   No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.   Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.   Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).   "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."   Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."   Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).   "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."   Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted)

(emphasis in original). "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'" Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); accord Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

II.   THE UNDISPUTED MATERIAL FACTS

The following material facts are accepted as undisputed, solely for purposes of the pending motions. The facts are drawn from the parties' joint statement of undisputed facts and the deposition testimony, sworn declarations and sworn oral statements in the record. The oral statements were taken by the EEO investigator and are called "affidavits" in the record of the investigation.

The relevant events in the instant case began with the announcement in December 2011 of two vacancies for a Supervisory Environmental Specialist at the GS-13 level in the Bureau's Environmental Assessment Section, Office of Environment. The

Environmental Assessment Section of the Office of Environment was going to be divided into two units in March 2012, and the Bureau needed two GS-13 Supervisory Environmental Specialists to head those units.  Each supervisor would lead a staff of professionals with expertise in application of the National Environmental Policy Act, the Coastal Zone Management Act and other laws and regulations to help the Bureau manage the exploration and development of the nation's offshore energy resources in a sound environmental manner.  Rowe, Tershara Matthews and Lissa Lyncker, who were all employees of the Environmental Assessment Section, applied for the job openings.

After the application period closed, the Bureau's Human Resources Office sent lists of qualified candidates and each qualified candidate's application to Gary Goeke, the Chief of the Environmental Assessment Section, who was the selecting official for the positions.  Rowe was already a GS-13 and thus was listed on the "non-competitive certificate" of candidates.  Matthews and Lyncker were both GS-12 employees and were on the "merit promotion certificate."

Rowe has a master's degree in biology.  When he applied to be a Supervisory Environmental Specialist in December 2011, he had been in his then-current position as a GS-13 Biologist for the Bureau since 2007, with 21 years of total experience working for various federal agencies.  Goeke had been plaintiff's direct supervisor since January 2009, had previously selected Rowe for his GS-13 biologist position and had consistently

given plaintiff "superior" and one "exceptional" (the highest possible) performance ratings in prior years.  Robert Martinson had supervised plaintiff before Goeke.

Goeke supervised Matthews when she first came to work at the Bureau in December 2008, after which Martinson supervised her until he left the local office in March 2011.  Lyncker began working at the Bureau in 2010 and was also supervised by Martinson until March 2011, and then by Goeke.

Goeke reports to Joseph Christopher, who is Program Manager for the Bureau and serves as Regional Supervisor of the Office of Environment for the Gulf of Mexico Outer Continental Shelf Region.  Christopher reviewed and approved Goeke's selections of Matthews and Lyncker for the two Supervisory Environmental Specialist vacancies in March 2012.  In February 2012, Barry Obiol became the Deputy Regional Supervisor of the Office of Environment and also began to supervise Goeke.  However, Christopher was still considered Goeke's first-line supervisor.  Christopher in turn reports to John Rodi, the Bureau's Regional Director for the Gulf of Mexico Outer Continental Shelf Region.

In mid-March 2012, Goeke selected Matthews and Lyncker for the two Supervisory Environmental Specialist positions.  The Supervisory Environmental Specialist positions entailed both supervisory and non-supervisory duties.  Major supervisory duties included overseeing development of so-called "NEPA documents" (NEPA is an acronym for the National Environmental Policy Act), coordinating input

8

from a multi-disciplinary team of scientists involved with environmental policy issues and analysis, and being responsible for managing and coordinating the activities of professional and technical personnel forming a multi-disciplinary core staff. Although Rowe had prior experience as a lead coordinator of several NEPA documents and more years of experience with the Bureau and other federal agencies than Lyncker or Matthews, Goeke selected Matthews to supervise the coastal zone management unit and Lyncker to supervise the other unit. The selections resulted in promotions to GS-13 for both women.

Lyncker has an undergraduate and a master's degree in biological sciences with an emphasis in estuarine and coastal ecology. Before her selection as a Supervisory Environmental Specialist, she was an Environmental Protection Specialist at the Bureau and had worked as a Subject Matter Expert for Environmental Impact Statements (also called NEPA documents) prepared for offshore lease sales. She was the lead coordinator on one Environmental Impact Statement before her selection and was still leading that document when she was chosen for the vacancy at issue. Prior to working at the Bureau, she was a contract employee working as an environmental manager for the United States Army Corps of Engineers and before that she was an environmental consultant preparing Environmental Impact Statements for an engineering firm.

When Matthews was selected for the unit supervisor position, she had a master's degree in health administration and a bachelor's degree in biology. According to her

resumé, she completed a doctorate in coastal sciences in August 2012, about five months after she was selected for the promotion. Before her selection, she worked as a Coastal Zone Management Coordinator for the Bureau, preparing consistency determinations under the Coastal Zone Management Act.

Goeke announced the selection of Matthews as a Supervisory Environmental Specialist on March 16 and the selection of Lyncker on March 21, 2012. As unit supervisors, Matthews and Lyncker both reported to Goeke. Lyncker became Rowe's first-line supervisor on March 25, 2012.

The units headed by Matthews and Lyncker were primarily responsible for coordinating the preparation of Environmental Impact Statements for Outer Continental Shelf lease sales and special environmental assessment projects relating to oil and gas exploration and development. Preparation of an Environmental Impact Statement in accordance with the National Environmental Policy Act is a highly complex task that can take as much as two to three years to complete and involves meeting hundreds of deadlines so that the sale will occur as scheduled. Environmental Impact Statements are prepared almost completely in-house by the Office of Environment's staff of Subject Matter Experts, most of whom have advanced degrees, including many doctorates, and expertise in archaeology, air and water quality, economics, geology, physical oceanography, marine biology, coastal biology, ornithology and many other disciplines.

At the "kick-off" of a new Environmental Impact Statement, Subject Matter Experts are formed into a team of about 40 people, led by a non-supervisory Environmental Impact Statement Coordinator and a Co-Coordinator, or two, who work for Goeke. The Coordinator leads the project from start to finish, establishing all critical action dates, ensuring that actions are accomplished on time and that products are of high quality.

Goeke selected Matthews and Lyncker for the unit supervisor positions after interviewing all qualified applicants whose names the Human Resources Office had submitted to him. He used a standard list of 15 questions and took notes during the interviews. He testified that he believed that Matthews and Lyncker each had a very good education, had demonstrated good leadership qualities while they worked at the Bureau and had shown a commitment to work and to whatever was necessary to get the job done. Goeke testified that he selected both candidates based on several factors, including their strong work ethics, strong team leadership qualities, strengths as employees in their previous positions and interview performances.

Lyncker and Matthews each had worked previously as a temporary acting supervisor, which Rowe had not. However, Goeke testified that whether a candidate had past experience as an acting supervisor was not a factor in his decision. He also stated that Rowe's past experience as a lead coordinator on several Environmental Impact

Statements was not necessarily important in his selection process.  Goeke testified that Rowe did not have team leadership experience.

Goeke destroyed all of his interview notes after Lyncker and Matthews accepted the positions.  He testified that the notes were confidential and that it was his standard practice to destroy them, a practice that had never before been challenged.

Christopher similarly testified that whether Rowe had prepared more Environmental Impact Statements than other applicants would not have been important in the selection process.  Christopher stated that experience is important, but is not the only factor considered in selecting someone for a leadership position.

Christopher knew that Rowe was on the list of qualified applicants for a Supervisory Environmental Specialist position, but Goeke did not discuss plaintiff's candidacy with Christopher before or after Goeke selected Lyncker and Matthews.  Christopher testified that, when Goeke reported his selections to Christopher, Goeke said he was confident that Lyncker and Matthews would do well as leaders, based on the work they had previously done.  Christopher had no reason to object to Goeke's selections and he signed off on them.

Christopher was not surprised that Goeke did not select Rowe because Christopher had firsthand knowledge of Rowe's lack of supervisory skills.  While Christopher always considered plaintiff a good employee, Christopher believed that Rowe, during his stint as lead coordinator on the Atlantic G & G [Geological and Geophysical] Programmatic

12

Environmental Impact Statement, had demonstrated that he was not a competent leader and would not make a good manager or supervisor.

Goeke, Christopher and Martinson testified about problems they had with Rowe while he led the Atlantic G & G Environmental Impact Statement in 2010 and early 2011. Plaintiff's teammates repeatedly complained to these three supervisors that Rowe was not sharing information. Christopher received numerous complaints from team members about what he called Rowe's "ineffective communication and inability to work independently as a lead coordinator," and he relayed those complaints to Goeke. When Goeke expressed those concerns to Rowe in January 2011, plaintiff reacted by sending to the team members several dozen e-mails that they had not seen before. According to Goeke, Rowe would not stop sending the e-mails when Goeke asked him to stop. Christopher, who received the e-mail "dump" from plaintiff, immediately held a meeting with him to discuss his "inappropriate reaction to the objective criticism." Rowe was removed from the Atlantic G & G project soon thereafter because there was a lot of dissension on the team. Christopher deposition, Record Doc. No. 31-6 at pp. 23-24; Defendant's Exh. 2, Christopher declaration, Record Doc. No. 37-4, at ¶¶ 9-12; Goeke deposition, Record Doc. No. 31-4 at pp. 45-46; Martinson deposition, Record Doc. No. 31-26 at p. 19. Christopher told Martinson that Rowe's removal from the project would not affect plaintiff's performance rating or promotion potential. Id. Rowe received a

"superior" performance evaluation from Goeke for the fiscal year October 1, 2010 to September 30, 2011.  Record Doc. No. 31-27 at pp. 9-15.

Goeke testified that, after Rowe was removed from the Atlantic G & G team, Goeke and Rodi, the Regional Director, discussed what plaintiff was going to work on if he did not work as a Coordinator.  Goeke said that the issue came up because his staff of GS-13 employees consisted only of Environmental Impact Statement Coordinators. Rodi and Goeke discussed whether Goeke could have a GS-13 on his staff who is not an Environmental Impact Statement Coordinator.  Goeke testified that the conversation did not concern a proposed action aimed at any individual, but was a discussion of a general policy issue.  Goeke deposition, Record Doc. No. 31-4 at pp. 63-64.

In early 2012, Rowe was assigned as the Lead NEPA Coordinator on a Supplemental Environmental Impact Statement entitled WPA/CPA 233/231.  The team led by Rowe included Goeke, Matthews, Lyncker, Brian Cameron, Ken Ashworth, Debbie Miller and Pat Adkins.  During the summer of 2012, Goeke, Matthews and Lyncker, the three supervisors on the project,[1] saw that the document was falling behind schedule and that the team was having difficulty meeting its milestones.

Lyncker and Matthews believed that Rowe was not communicating adequately with the team about the assignments or project progress and was not fully cooperating

_____

[1]Matthews did not supervise Rowe directly, but would review his work if asked to do so by Lyncker or Goeke.  Matthews deposition, Record Doc. No. 31-7 at pp. 24-25.

with all team members, especially not with Lyncker.  Goeke thought that Rowe backed off from his responsibilities as lead coordinator after Lyncker was appointed unit supervisor.  Between March 25, 2012, when Lyncker was promoted, and September 2012, she observed that Rowe seemed angry about her selection for the position and about being under her direct supervision.  Lyncker noticed that Rowe would not talk to her orally or by e-mail, did not copy her on e-mails that he sent to others containing information she needed to know, submitted his leave requests to Goeke rather than to her, would not even look at her and communicated primarily with Goeke.  Goeke became aware that Rowe was not including Lyncker on e-mails that plaintiff sent to headquarters or the Office of the Solicitor, about which she, as his first-line supervisor, needed to be informed.

It appeared to Lyncker, Matthews and Goeke during this time period that Rowe was unaware of how far behind he was in coordinating the supplemental Environmental Impact Statement.  Lyncker prepared "to do" lists to help him get the document back on schedule.  At a managers' meeting, Matthews raised the possibility of pulling Rowe off the project because he was not performing adequately and was missing deadlines, and the team needed to get the document done on time.  Matthews deposition, Record Doc. No. 31-7 at pp. 34-36, 42.  However, he was not removed from the project.

Rowe contacted a counselor in the Bureau's EEO office on April 3, 2012.  On May 15, 2012, he filed a formal complaint of gender discrimination, alleging that he had not

been selected for the Supervisory Environmental Specialist position despite being much better qualified than Lyncker and Matthews.  Record Doc. No. 31-23 at pp. 1-2.

On August 6, 2012, Miller, the editor of the Supplemental Environmental Impact Statement, asked Rowe if he had chapters of it ready for her review because it was to be sent to headquarters and the Office of the Solicitor for their comments on August 27, 2012.  Lyncker gave plaintiff a "to do list" of tasks he still needed to accomplish regarding two of the chapters on August 26, 2012.  Record Doc. No. 31-10 at p. 49.

In September 2012, headquarters and the Office of the Solicitor returned the draft Supplemental Environmental Impact Statement to the Bureau with their comments.  The team led by Rowe worked during October to get the document ready for final review by the same two offices before it could be published.  During that time, Lyncker was also leading another Environmental Impact Statement, interviewing 30-40 people for vacant positions, hiring and overseeing five new employees, and doing year-end performance evaluations for the employees she supervised.  From her perspective, she "pretty much had to hold [Rowe's] hand" from July through September to meet deadlines for the Supplemental Environmental Impact Statement that he was coordinating.  Lyncker affidavit, Record Doc. No. 31-16 at pp. 24-28.  Lyncker testified about how she, Matthews, Goeke and Cameron all had to step in to assist plaintiff in carrying out tasks and meeting deadlines on his document.  Lyncker deposition, Record Doc. No. 31-5 at pp. 43-48.  Lyncker testified that Rowe was the only employee to whom she needed to

16

provide that level of assistance and that she had no similar problems with any other employee.  Id. at pp. 51-53, 107, 109-10.

Lyncker testified that she never threatened plaintiff with a demotion and that his supervisors never discussed demoting him.  She testified that Goeke and Christopher discussed with her whether a GS-13 employee could be maintained in that current position if he could not perform at a GS-13 level.  She said the conversation arose because of various incidents over the course of plaintiff's work when upper management had to step in to help him produce the necessary work product.  Id. at pp. 43-44.

Christopher testified that he and Rodi never discussed a potential demotion of Rowe.  Christopher stated that he and Rodi had a conversation in a general sense, which was not specific to anyone, that the Bureau "cannot carry GS-13s who are our most senior people if they are not performing in their jobs."  Christopher testified that the discussion occurred because "[t]here was concern that Mr. Rowe had stopped working." Christopher said he has had this same conversation many times over the years because GS-13 employees are supposed to function with minimal supervision as they lead projects and their managers must be able to count on them to get projects completed.  He stated that it "filtered up to" him after Lyncker was selected that Rowe did not want to work for her and "pretty much stopped carrying the ball."  Christopher deposition, Record Doc. No. 31-6 at pp. 28-30.

Coordinators of NEPA documents routinely work overtime or cancel scheduled leave when necessary to meet a critical deadline, as do other team members.  The team members for plaintiff's Supplemental Environmental Impact Statement agreed to work on Saturday, October 6, 2012, to get it finished, so that the editor could review it on Sunday, October 7, 2012.  It was essential that the document be finished by that day so it could be sent to the Office of the Solicitor and headquarters for their final review on Tuesday, October 9, 2012.

Rowe, the leader of the team, had previously requested annual leave for Thursday, October 4, 2012.  Goeke and Lyncker deferred his request until Wednesday, October 3, 2012, when they would meet to assess the project's status and decide whether to grant the request.  Rowe was scheduled to take his compressed day off[2] on Friday, October 5, and he did not want to work on Saturday, October 5, 2012.

Goeke, Matthews and Lyncker met in the afternoon of Wednesday, October 3, 2012, to discuss the status of the Supplemental Environmental Impact Statement.  According to Lyncker, they had been "micromanaging [Rowe] because he was not stepping up and getting tasks done by the due dates."  She testified that this was a "micromanaging meeting," with lists to tell plaintiff what to do and when.  The Environmental Assessment Section was very short-staffed and employees in both units

---

[2]Bureau employees work a compressed schedule of nine-hour days and then take one day off. Rowe testified that he takes off every other Friday.  Rowe affidavit, Record Doc. No. 40-9 at p. 5 (p. 54 of affidavit transcript).

were working overtime to get things done.  Lyncker observed that Rowe "never offered to help with any other projects, and he made doing his project difficult because we had to direct him to get things done."  Lyncker affidavit, Record Doc. No. 31-16 at pp. 31-32.

Rowe came to the meeting just before leaving for the day on October 3, 2012. Although he had tasks left to do before the October 9, 2012, deadline, he said that he was going to be off on Friday and indicated that one of the three supervisors should take care of the work.  Lyncker told him that he needed to work on Friday.  According to her and Goeke, she told him that he "needed to pull his weight" as a team member and could not leave the other members working overtime and on their own compressed days off to do things that he should be doing, while he took a day off.  Id. at pp. 33-34; Memorandum for Record, Defendant's Exh. 5-B, Record Doc. No. 37-19.  Goeke testified that he and Lyncker told Rowe that they expected him, as an Environmental Impact Statement Coordinator, to be at work when his team was there working on his document to guide them and give them answers, as the supervisors expected of any team leader.  Plaintiff alleges that Lyncker "accused" him "of not pulling his own weight" and not being a team player.  The court resolves this slight semantic difference in favor of Rowe's recollection that Lyncker said he was not pulling his weight or being a team player.  Rowe told Lyncker at the meeting that he finished his work during his normal work hours and did not need to work overtime.  His leave request for the next day was denied.

Later that afternoon, Lyncker sent an e-mail to plaintiff listing the tasks that he needed to complete on Friday and Saturday, October 5 and 6, 2012. At his request, she clarified in an e-mail the next morning that she was ordering him to work on those days because the remaining work was "mission critical" and advised him that "you, as NEPA coordinator[,] are required to be in the building to lead the effort." She stated that he would receive comp time or overtime for the extra work days. Record Doc. No. 31-31 at pp. 27-28. Lyncker had the authority to order an employee to work on his compressed day off and to deny leave if the workload required the employee to work.

On Thursday, October 4, 2012, Rowe called a meeting with Goeke; the Deputy Regional Supervisor, Barry Obiol; and plaintiff's union representative, Earl Thompson, to complain about the events of the previous day and that morning. Rowe did not want Lyncker at the meeting, but Thompson insisted that she must be there as plaintiff's immediate supervisor, so she was summoned. Lyncker told Thompson that everyone was working overtime and Rowe was the only one who was not. Thompson asked plaintiff if he could work on Friday and Saturday, and he said that he could. Lyncker affidavit, Record Doc. No. 31-16 at pp. 38-40; Lyncker's Memorandum for Record, Defendant's Exh. 5-C, Record Doc. No. 37-20.

As she did with all employees under her supervision and as she had the authority to do, Lyncker approved some of plaintiff's leave requests and denied others, depending

20

on the status of the work for which he was responsible.  Specifically, she approved leave

for him on May 15, June 18, September 13, and November 13 and 28, 2012.

On October 9, 2012, Rowe amended his EEO charge of discrimination to include

claims of a hostile work environment and retaliation by Lyncker and Goeke regarding

the events of the past week.  Record Doc. No. 31-23 at p. 35.

On October 31, 2012, Lyncker rated Rowe as "fully successful" in his annual

performance evaluation.  Defendant's Exh. 5-D, Record Doc. No. 37-21.  Goeke and

Lyncker met with Rowe to discuss his evaluation.  Before Lyncker became his

supervisor, Rowe had consistently received higher performance ratings from Goeke.

According to Goeke, the "fully successful" rating meant that Rowe had done everything

that was expected of him in fiscal year 2012, but could have been more vigilant.  Goeke

always considered Rowe a good employee.

Rowe testified that, during the evaluation meeting, Lyncker "specifically

mentioned that she talked to John [Rodi, the Regional Director] and . . . John wanted to

know if I needed to be moved down to a GS-12, which would have been a demotion."

Rowe affidavit, Record Doc. No. 40-8, at p. 11 (p. 43 of affidavit transcript).  Plaintiff

continued:

> I don't know whether you consider [that] a threat from John Rodi or Lissa
> Lynker [sic] . . . .  I'm sure Lissa's going to say, no, she didn't threaten me,
> because the way she started off the sentence when she said it was "I don't
> want you to consider this a threat, but John asked if you needed to be down

to a 12." Whenever you start off a sentence, I don't want you to consider this a threat, to me, that's a threat. . . .

I don't know if you can consider it a threat from John Rodi. I consider it more from Lissa Lynker [sic] because they would have to start the proceedings for a demotion, and the demotion is not immediate around here unless you did something really bad. The demotion, they would have to start knocking you down on your performance appraisal ratings, and once you're down to a certain level, they'd have to try and do some plan and bring you back. But if they continue to knock you down on your performance ratings, eventually, they can demote you.

Id. at pp. 13-14 (pp. 45-46 of affidavit transcript).

In preparation for the October 31 evaluation meeting, Lyncker drafted handwritten notes for each appraisal element, noting her reasons for the ratings and ways that plaintiff could improve his performance. She read the list to him verbatim at the meeting and he took notes. Rowe disagreed with the evaluation and told Lyncker that he intended to appeal. He e-mailed Lyncker after the meeting to ask for a written list of her suggested improvements. Lyncker responded multiple times by e-mail and orally that she was extremely busy at that time, but she would provide the list. She did not consider herself bound by his request that she do it immediately and she was not aware that there was any deadline set by any Bureau policy to provide the written list. Lyncker affidavit, Record Doc. No. 31-16 at pp. 48-49; Lyncker deposition, Record Doc. No. 31-5 at pp. 91-94; Rowe affidavit, Record Doc. No. 40-8 at p. 17 (p. 49 of affidavit transcript). Lyncker believed her handwritten notes would be more legible if they were typed. She finished

typing them on December 4, 2012, almost five weeks after the evaluation meeting. Defendant's Exh. 5-E, Record Doc. No. 37-22.

Under the Bureau's policy in 2012, an employee who does not agree with his performance appraisal rating may request reconsideration. The first step in the process is an "informal reconsideration." At this step, the employee and the rating official should informally attempt to resolve any disagreement about the appraisal. The employee should initiate the informal step with the rating official within seven calendar days of the performance appraisal. If an agreement cannot be reached informally, the employee may request formal reconsideration through the Human Resources Office.

On November 7, 2012, plaintiff contacted Warren Jones, Labor Relations Specialist, about the reconsideration process. Rowe said he intended to ask Lyncker for informal reconsideration of his performance appraisal. He asked Jones who would be the point of contact for a formal reconsideration, if Lyncker would not change the rating. Jones responded that he would be the point of contact and gave plaintiff a copy of the Bureau's written policy.

On November 14, 2012, Rowe met with Jones to discuss the performance appraisal reconsideration process. The following day, plaintiff notified Jones that he had asked Lyncker for a written list of his performance deficiencies and ways to improve, but had not received it. Rowe claimed that he needed the requested information to proceed with the reconsideration process. That is not accurate, according to defendant's policy.

23

Jones advised Rowe that the lack of response from his supervisor regarding an informal meeting allowed him to move forward to formal reconsideration.  If Rowe believed that Lyncker was not answering him timely, he could have complained to her supervisor. Lyncker affidavit, Record Doc. No. 31-16 at p. 69.  Rowe did not contact the Human Resources Office to request formal reconsideration of his appraisal and did not submit a written reconsideration request, as the policy required.

On December 12, 2012, Rowe filed another EEO complaint alleging reprisal by Lyncker and Goeke, based on his performance evaluation on October 31, 2012.  Record Doc. No. 31-23 at pp. 7-9.

In 2013, at plaintiff's request, his supervisors arranged for him to transfer out of Goeke's section.  According to Christopher, "it became clear that in order for Mr. Rowe to be a productive employee, we would have to make some move."  Christopher deposition, Record Doc. No. 31-6 at pp. 20-21.  Rowe transferred to the Environmental Operations Section under the supervision of Terri Thomas in the summer of 2013. Thomas gave him a "superior" performance rating for his work between June 16 and September 30, 2013.  Record Doc. No. 31-11 at pp. 22-27.

III.   <u>ANALYSIS</u>

A.   <u>Plaintiff's Gender Discrimination Claim</u>

Title VII makes it unlawful for an employer to discriminate against an employee "because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).  Both parties refer to Rowe's gender discrimination claim as one of failure to promote.  Although Lyncker and Matthews were promoted from GS-12 to GS-13 when they were selected, Rowe would <u>not</u> have received a promotion or any pay increase if he had been chosen.

"It is well established that the denial of a purely lateral transfer is not an adverse employment action redressible under Title VII.  It is equally well established, however, that the denial of a promotion <u>is</u> an actionable adverse employment action."  <u>Alvarado v. Tex. Rangers</u>, 492 F.3d 605, 612 (5th Cir. 2007) (citations omitted); <u>accord</u> <u>Thomas v. Kent</u>, 401 F. App'x 864, 865-66 (5th Cir. 2010).  "[T]he denial of a transfer <u>may</u> be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits . . . if the position sought was objectively better."  <u>Alvarado</u>, 492 F.3d at 614.  Rowe testified, and defendant does not dispute, that the unit supervisor job entailed more responsibilities and was more prestigious than his then-current position.  He alleges that gaining supervisory experience would have increased his opportunities for a future promotion.  The Bureau has <u>not</u> moved to dismiss his discrimination claim on the basis that the job he sought was a "purely lateral transfer,"

25

and the court therefore assumes that the failure-to-promote analysis applies to plaintiff's gender discrimination claim.

Title VII requires plaintiff to show intentional discrimination, which may be proven by either direct or circumstantial evidence.

> When there is no direct evidence of discrimination, a claim will be analyzed under the familiar McDonnell Douglas burden-shifting framework. Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 411 (5th Cir. 2007); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 . . . (1973). Because there is no direct evidence of discrimination here, the McDonnell Douglas framework applies.
>
> Accordingly, the plaintiff alleging discrimination must first make a prima facie showing that:  "(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position." Burrell, 482 F.3d at 412. If the plaintiff succeeds in making the prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employer's action. McDonnell Douglas, 411 U.S. at 802 . . . . If the employer offers a nondiscriminatory reason, the burden shifts back to the plaintiff to show that "the defendant's proffered reason is not true, but instead is a pretext for intentional discrimination." Price v. Fed. Exp. Corp., 283 F.3d 715, 720 (5th Cir. 2002); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 . . . (2000). A plaintiff may demonstrate pretext by "showing that the employer's proffered explanation is false or unworthy of credence." Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) . . . . "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." Id. Alternatively, a "fact finder can infer pretext if it finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected." EEOC v. La. Office of Cmty. Servs., 47 F.3d 1438, 1444 (5th Cir. 1995); see also Price, 283 F.3d at 723.

Churchill v. Tex. Dep't of Crim. Justice, 539 F. App'x 315, 318 (5th Cir. 2013) (emphasis added); see also Gregory v. Town of Verona, 574 F. App'x 525, 527-28 (5th

Cir. 2014) (prima facie case of failure to promote requires evidence that "(1) [plaintiff] was not promoted; (2) he was qualified for the position he sought; (3) he fell within a protected class at the time of the failure to promote; and (4) the defendant either gave the promotion to someone outside of that protected class or otherwise failed to promote the plaintiff because of his [protected characteristic].").  The Bureau does <u>not</u> contend that Rowe cannot establish a prima facie case.

The burden therefore shifts to the Bureau to proffer legitimate, nondiscriminatory reasons for not having selected Rowe.  <u>Id.</u> at 528.  This "burden is one of production, not persuasion," <u>Reeves</u>, 530 U.S. at 142 (quotation omitted), and "involv[es] no credibility assessments."  <u>Russell v. McKinney Hosp. Venture</u>, 235 F.3d 219, 222 (5th Cir. 2000). Defendant "need not prove that it was actually motivated by its proffered reason. . . .  The employer need only articulate a lawful reason, regardless of what its persuasiveness may or may not be."  <u>Joseph v. City of Dallas</u>, 277 F. App'x 436, 439 (5th Cir. 2008) (quotation and citations omitted); <u>accord Turner v. Kan. City S. Ry.</u>, 675 F.3d 887, 900 (5th Cir. 2012).  Thus, the Bureau must merely set forth, through admissible evidence, "reasons for its actions which, <u>if believed by the trier of fact</u>, would support a finding that unlawful discrimination was not the cause of the employment action."  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993).

Defendant has produced such reasons.  Goeke, the selecting official, interviewed all of the applicants who had made the "Best Qualified List."  Rowe's allegation that

Goeke did not ask standardized questions or take any notes during the interviews is unsupported by the evidence.  The competent evidence in the record shows that Goeke asked all applicants a standard list of 15 questions and that he took notes.  In addition, Goeke testified that the job requirements were not based solely on years of experience, but on a number of factors.  Goeke, who had supervised Rowe, Matthews and Lyncker for a few years, stated his belief that both women exceeded Rowe in their leadership qualities, commitment to work and ability to do whatever was required to get the job done.  Record Doc. No. 46, Undisputed Fact Nos. 38, 39.  Goeke had previously selected men, including Martinson and Rowe, for positions at the GS-13 level.  Christopher also testified that whether Rowe had prepared more Environmental Impact Statements than other applicants would not have been important in the selection process.  Christopher stated that experience is important, but is not the only factor considered in selecting someone for a leadership position.  These reasons satisfy defendant's burden.

The burden thus "shifts back to [Rowe] to demonstrate pretext."  Gregory, 574 F. App'x at 528.  Like other plaintiffs in numerous Fifth Circuit cases, Rowe contends that the Bureau's reliance on "'subjective criteria' [such as leadership skills] automatically establishes a fact issue, making summary judgment inappropriate.  This is a misreading of [Fifth Circuit] case law."  Id.  An employer's mere use of subjective criteria is not sufficient evidence of pretext.  Id. at 529 (citing Manning v. Chevron Chem. Co., 332 F.3d 874, 882 (5th Cir. 2003)).  "[A]bsent evidence that subjective hiring criteria were

used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will <u>rarely, if ever, prove pretext</u> under Title VII." <u>Manning</u>, 332 F.3d at 882 (quotation omitted) (emphasis added); <u>accord</u> <u>Churchill</u>, 539 F. App'x at 318-19; <u>Browning v. Sw. Research Inst.</u>, 288 F. App'x 170, 177 (5th Cir. 2008); <u>Joseph</u>, 277 F. App'x at 440-41. "Even so, an employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee." <u>Churchill</u>, 539 F. App'x at 318 (quotation omitted).

The Bureau has articulated specific reasons. Lyncker and Matthews were both qualified for the position. The personal and professional qualities that informed Goeke's choices were clear, specific, relevant to the requirements of the position and based on each candidate's application and interview and Goeke's knowledge of her past job performance. Goeke and Christopher both testified that years of experience was neither the sole nor the most important factor on which the selections were based. If years of experience were the sole relevant factor, the Bureau would not need to interview the applicants, but could just pick the one with the longest resumé. An employer must make judgments about individual qualifications to choose between candidates, and a plaintiff's argument that such choices are subjective does not prove pretext. <u>See</u> <u>Joseph</u>, 277 F. App'x at 441 (Defendant "provided a 'clear and reasonably specific basis for its subjective assessment,' namely that Joseph provided poor answers to the hypothetical police scenarios and seemed unable to logically process information."); <u>Price</u>, 283 F.3d

at 723 (employer entitled to summary judgment when evidence showed that it valued the chosen candidate's military experience and other skills over plaintiff's college degree, greater management experience and other qualifications).

Rowe argues that Goeke's failure to preserve his interview notes after he made the selections violated the Bureau's policy and creates an inference of pretext. However, Jean Rumney, Branch Chief of the Bureau's Human Resources Office, declares that her office did <u>not</u> advise selecting officials in March 2012 that they were required to keep their interview notes for any period of time. She states that her office did <u>not</u> advise Goeke that he must keep his interview notes for two years, but simply recommended that he keep them for a period of time. Rumney declaration, Defendant's Exh. 1, Record Doc. No. 37-2 at ¶ 3.

Although Goeke did not comply with that recommendation and destroyed his notes, as was his standard practice, "'this is simply not a case where the defendant relies on nothing more than a[n] unexplained interview score that might be consistent with discriminatory intent.' Although conceding that [the interviewer's] interview notes were lost, [defendants] have extensively explained the scores through deposition testimony . . . ." <u>Assariathu v. Lone Star Health Mgmt Assocs., L.P.</u>, 516 F. App'x 315, 319 (5th Cir.), <u>cert. denied</u>, 134 S. Ct. 317 (2013). As the Fifth Circuit "has stated many times, '[A]n employer's 'disregard of its own hiring system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation

for an action is pretextual.'"  Churchill, 539 F. App'x at 320 (quoting Equal Emp'mt

Opportunity Comm'n v. Tex. Instruments Inc., 100 F.3d 1173, 1182 (5th Cir. 1996)

(internal quotation omitted)); accord Assariathu, 516 F. App'x at 320-21.  Defendant's

"disregard of its own hiring system does not prove [gender] discrimination absent a

showing that discrimination was a motive in the action taken."  Churchill, 539 F. App'x

at 320 at n.4 (quoting Sanchez v. Tex. Comm'n on Alcoholism, 660 F.2d 658, 662 (5th

Cir. 1981)) (emphasis added); accord Hiner v. McHugh, 546 F. App'x 401, 407 (5th Cir.

2013).  Rowe has merely speculated and has presented no evidence that Goeke's failure

to preserve his notes was motivated by gender discrimination.

Rowe conjectures, without citing any competent summary judgment evidence, that

Goeke, a male, pre-selected Lyncker and Matthews, two women, for the vacancies, which

demonstrates gender bias.  Even if these choices were pre-selected, the Fifth Circuit has

held that

> "[p]re-selection, in and of itself, does not establish pretext unless the
> preselection was motivated by discriminatory animus."  Cf. Walsdorf v.
> Bd. of Comm'rs for the E. Jefferson Levee Dist., 857 F.2d 1047, 1051 (5th
> Cir. 1988) ("Plaintiff's analysis would have us ignore the evidence that
> [defendant] preselected [selectee] for the position in a process which, at
> least initially, may not have been motivated in any way by his animus
> toward women in the workplace."); Glass v. Lahood, 786 F. Supp. 2d 189,
> 224 (D.D.C. 2011) ("[T]here is nothing per se improper about 'pre-
> selection,' at least from the standpoint of Title VII.  For evidence of
> preselection to be relevant, there must be indicia of discrimination attached
> to the preselection.").

Hiner, 546 F. App'x at 407 (emphasis added).  In the absence of any evidence of pre-selection or that such pre-selection, if it existed, was motivated by discriminatory animus against men, Rowe fails to create a material fact issue of pretext with this allegation.

Plaintiff asserts that Goeke and Christopher exhibited favoritism toward Lyncker and Matthews, which must have been gender-based.  Rowe's only evidence of alleged favoritism toward Matthews is that she (like Lyncker) was a temporary acting supervisor, which gave them supervisory experience that he did not have.  However, Goeke testified without contradiction in the record that the acting supervisor position was available to several employees, including Rowe.  There is no evidence that Rowe applied or was turned down for that opportunity.  In any event, Goeke testified that acting supervisor experience was not a factor in his selections.  Plaintiff has produced no evidence that either Matthews or Lyncker was offered the acting supervisor job or was permitted to stay in the job for longer than Bureau policy dictated because of their gender.  Their prior service as acting supervisors creates no inference that Goeke's selection of Matthews or Lyncker, rather than Rowe, was gender discrimination.

Rowe bases his allegation of gender-based favoritism towards Lyncker on a few additional incidents.  First, he contends that Lyncker was "flirtatious" with Goeke and Christopher and that the two men favored her professionally because of it.  Plaintiff's only evidence of alleged flirtatiousness is a comment that Lyncker made about wearing

a bikini if a meeting were held in Key West.[3]  Neither Goeke nor Christopher recalled

hearing that comment.  They both denied that Lyncker was flirtatious or that they were

influenced in their job decisions by female flirtatiousness.  There is no evidence that

Goeke or Christopher made any remarks reflecting gender animus against males.

Christopher did not participate in the selections, except to sign off on Goeke's decision.

Goeke previously selected Rowe and Martinson, both male, for high level positions.

Even if Lyncker made the comment and Goeke heard it, no reasonable factfinder could

infer from that single comment that Goeke selected her and did not select Rowe <u>because</u>

<u>of</u> their genders.

Indeed, as a matter of law, a supervisor's favoritism towards someone based on

their personal relationship, even if the relationship consists of a romantic affair, "is not

sex-based discrimination, as the favoritism, while unfair, disadvantages both sexes alike

for <u>reasons other than gender</u>. . . .  [S]uch 'paramour favoritism' is not an unlawful

employment practice under Title VII . . . ."  <u>Wilson v. Delta State Univ.</u>, 143 F. App'x

611, 613-14 (5th Cir. 2005) (quotation omitted) (citing <u>Ackel v. Nat'l Commc'ns, Inc.</u>,

339 F.3d 376, 382 (5th Cir. 2003); <u>Green v. Adm'rs of the Tulane Educ. Fund</u>, 284 F.3d

642, 656 n.6 (5th Cir. 2002)) (emphasis added); <u>accord</u> <u>Jusuf v. Sw. Airlines Co.</u>, No.

08-10383, 2008 WL 4948615, at *4 (5th Cir. Nov. 20, 2008); <u>Ellert v. Univ. of Tex.</u>, 52

---

[3]Lyncker denied making the comment and it is not clear from the record if Rowe heard her say it, or was told by someone else that she said it.  Viewing the evidence in the light most favorable to plaintiff, the court assumes that Lyncker made the remark.

F.3d 543, 545-46 (5th Cir. 1995); see also Buenrostro v. Flight Safety Int'l, Inc., No. SA-99-CA0819FB, 2001 WL 674171, at *6 & n.42 (W.D. Tex. Mar. 2, 2001), report & recommendation adopted, 2001 WL 685719 (W.D. Tex. Mar. 28, 2001), aff'd in relevant part, 62 F. App'x 556 (5th Cir. 2003) (citing Ellert, 52 F.3d at 545-46) (quoting EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, EEOC Notice No. 915-048, at 2 (Jan. 12, 1990) (internal quotation omitted)) ("'An isolated instance of favoritism toward a "paramour" (or spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.'").

In a recent discrimination case that applied this principle, the female plaintiff argued that her male supervisor had treated her differently after the "much younger and prettier" assistant manager began working at the store.   Plaintiff testified that her supervisor had told her that the assistant manager was pretty and that "he just loved the way [the assistant manager] talked.  It just drove him crazy, her twang."  Plaintiff alleged that the supervisor became "aggressive, harsh, [and] derogatory" toward her and took the assistant manager's side during any disagreement.   The district court granted the employer's summary judgment motion based on the Fifth Circuit's rule that "paramour favoritism" is not an unlawful employment practice and cannot establish pretext for discrimination.   Card v. Fred's Stores of Tenn., Inc., No. 1:10CV1-B-D, 2011 WL 2692915, at *4-5 (N.D. Miss. July 11, 2011) (citing Wilson, 143 F. App'x at 613-14;

34

Ackel, 339 F.3d at 382; Green, 284 F.3d at 656 n.6).  The same rule applies in the instant case to Rowe's allegation that Goeke favored Lyncker because she was flirtatious.  As a matter of law, that type of favoritism is not gender discrimination.

Plaintiff's other evidence of favoritism towards Lyncker consists of three other incidents of such a trivial, immaterial and indicative-of-nothing nature that none could conceivably raise any inference of discriminatory motive regarding her selection.  First, Goeke placed Lyncker in an office near his own.  Rowe has proffered no evidence regarding the timing of or Goeke's motivation for that placement.

Second, Lyncker was not disciplined for having placed about 240 photographs of a bachelorette party on the Bureau's shared computer drive, which took up allegedly scarce space on the drive.  Rowe contends that he was "threatened" and investigated in similar circumstances when he hung an allegedly "humorous" movie poster on the wall at work.  Plaintiff's memorandum in support of motion for summary judgment, Record Doc. No. 38-3 at p. 3.

It is undisputed that Bureau employees, including Lyncker, occasionally put photos of social events involving employees on the shared drive, so that other employees could see them.  Lyncker testified without contradiction that she did not know how her bachelorette party photos got onto the drive under her name.  She did not intentionally place the photos on the drive and thought that they must have been uploaded accidentally.  She did not learn that the photos were on the shared drive until Goeke told

her about them.  Lyncker, Goeke and Christopher all admitted that the photos were inappropriate for the shared work drive.  Rowe brought the photos to Goeke's attention the day after Goeke announced Lyncker's selection for the vacancy, although one of plaintiff's witnesses, Bruce Baird,  testified that the photos had been on the drive at that point for three to four months.  The photos were removed from the drive immediately after Goeke learned of them.  Record Doc. No. 31-34 at pp. 1-2, e-mail from Rowe to Goeke dated March 22, 2012; affidavit of Bruce Baird, Record Doc. No. 31-18 at p. 21. Goeke did not discipline Lyncker regarding the photos, but he talked to her about them several times.  He told Lyncker that he knew she would not intentionally have placed the photos on the shared drive and he understood that it must have been an accident.  No investigation was required because the photos were posted in Lyncker's directory on the shared drive.  Lyncker deposition, Record Doc. No. 31-5 at pp. 111-13, 118-20, 142-44; Goeke deposition, Record Doc. No. 31-4 at pp. 72-75.

The incident regarding the "Untouchables" movie poster that Rowe had hung in two places in the office did not occur until May 2012, two months <u>after</u> Lyncker and Matthews were selected for the supervisory positions.  One poster was located outside Rowe's work space and one was outside Goeke's office.  The poster depicted four men with guns prominently displayed, with the central figure's gun pointed directly at the viewer.  Defendant's Exh. 3-A, Record Doc. No. 37-6 at p. 2. No one knew who had hung the posters.  Christopher directed Obiol to conduct an administrative investigation

36

in response to Rodi's expression that the posters were inappropriate in light of concerns about workplace violence. On May 14, 2012, Obiol e-mailed Rowe and Goeke to ask if they had any information about the posters. Three days later, Rowe admitted to Obiol that he had placed the posters on the walls. He stated that he did not intend them as threatening, admitted that he had made a poor choice and understood how some people might find them offensive. He offered to apologize to anyone he might have offended. Obiol orally counseled Rowe about his poor judgment, considering the violent nature of the posters. No formal disciplinary action was taken and no documentation of counseling was placed in Rowe's personnel file. Defendant's Exh. 3, Obiol declaration, Record Doc. No. 37-5 at ¶¶ 1-6. This incident was handled in a similar fashion as the bachelorette party photos. No rational factfinder could infer gender-based favoritism towards Lyncker based on these two trivial incidents in which Lyncker and Rowe were treated essentially in the same way.

On December 12, 2012, the same day that he filed his second EEO complaint against Goeke and Lyncker, Rowe complained to Obiol about a cartoon that had been displayed in an office hallway for several weeks. Plaintiff stated his belief that Goeke had placed the cartoon. Record Doc. No. 31-29 at p. 1. When Obiol investigated, a male employee admitted that he had hung the cartoon. Obiol removed the cartoon and orally counseled the employee. Defendant's Exh. 3, Obiol declaration, Record Doc. No. 37-5

at ¶¶ 7-8.  This similarly handled incident, nine months after Lyncker's selection, could not possibly lead to any inference of gender-based discrimination.

Third, Rowe contends that Goeke selected Lyncker for the vacancy despite her problems being on time and in attendance when she was supposed to be at work.  He asserts that she was "counseled" about this issue by her prior supervisor, Martinson, and by Obiol and Goeke.  However, Rowe had no personal knowledge of the arrangements that Lyncker had with her supervisors regarding attendance.  Lyncker and Martinson both testified that he never counseled her about such problems.  Martinson deposition, Record Doc. No. 31-26 at p. 17.  Goeke stated that Lyncker occasionally had a problem with attendance, but that she took approved leave whenever necessary.  Goeke stated that Obiol could not counsel her because he was her co-worker at first and was not her first line supervisor even when he became Acting Deputy Regional Supervisor.  Goeke testified without contradiction that he considered Lyncker's attendance record during the selection process, but that the problem was not important enough not to select her.  Plaintiff submits the declaration of Darice Breeding that Goeke mentioned to her on an unspecified date, which must have been before March 2011 when Martinson left the local office to take another position elsewhere, that Goeke was unhappy with Martinson for holding Lyncker "accountable for routinely coming to work late" and for sending Lyncker emails "taking her to task for her tardiness."  Breeding declaration under penalty of perjury, Record Doc. No. 31-29 at p. 23.  Assuming that this hearsay testimony would

be admissible, it does not raise a material fact issue that Lyncker's tardiness was significant enough as of March 2012 to disqualify her for the position or that Goeke overlooked her attendance problem, if any, <u>because of</u> Lyncker's gender.

Rowe argues that material fact issues exist regarding the credibility of Lyncker and Goeke because they did not agree in their testimony regarding which one of them removed the photos from the shared drive and because Lyncker would not admit that she had been counseled for time and attendance problems. Contrary to plaintiff's contention, Lyncker and Martinson both testified that Martinson had <u>not</u> counseled her, but had discussed the issue informally. Martinson did not use the word "counseling" when he asked Lyncker in e-mails dated September 24, 2010 and January 28, 2011 to inform him if she was running late. Lyncker deposition, Record Doc. No. 31-5 at pp. 34-41.

Regardless, the truth or falsity of the testimony and the credibility of Goeke and Lyncker regarding these issues are not material to the instant motion. Whether Lyncker or Goeke removed the photos from the drive and whether one of them lied about that in their testimony (as Rowe contends) or they merely had differing memories of a remote and trivial event[4] are immaterial to the issues raised by the summary judgment motions. Goeke testified that no investigation of the photos was needed because they appeared in

---

[4]Goeke testified that he did not recall that it was Rowe who told him about the photographs, did not remember how large the file was and only glanced at a few of the photos before they were removed. Goeke deposition, Record Doc. No. 31-4 at pp. 71-74. Lyncker testified that she did not delete the photos because she did not even know that they were on the shared drive until after Goeke removed them and then spoke to her about them. Lyncker deposition, Record Doc. No. 31-5 at pp. 125-29.

Lyncker's directory and that he talked to her about them several times.  He had already selected her for the position when Rowe brought the photos to his attention, so no inference of gender bias in the selection can be drawn, regardless of who deleted the photos.   Similarly, whether the e-mails from Martinson to Lyncker were formal counseling, as plaintiff argues, or merely informal discussions, as Lyncker and Martinson both testified, is immaterial.  No formal counseling documents were placed in Lyncker's personnel file by Martinson or Goeke.  Martinson no longer supervised Lyncker after March 2011, so even if she had attendance issues before that date, the problem was far removed in time from the selection process.  Goeke stated that Lyncker occasionally had a problem with attendance when he supervised her, but she took approved leave when necessary.  Goeke testified that none of these issues were relevant to his decision to select Lyncker for the unit supervisor position, and Rowe has produced no <u>evidence</u> to create a material fact issue that Goeke's motives were discriminatory.

Finally, Rowe's primary contention is that his qualifications were clearly superior to those of Lyncker and Matthews.  Evidence of clearly superior qualifications can establish pretext.

> "[A] showing that the unsuccessful employee was <u>clearly better qualified</u> is enough to prove that the employer's proffered reasons are pretextual." "[T]he bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those <u>disparities are 'of such weight and significance that no reasonable person . . . could have chosen the candidate selected over the plaintiff</u> for

the job in question.'" . . . .  "Showing that two candidates are similarly qualified does not establish pretext . . . ."

Gregory, 574 F. App'x at 529-30 (quoting Price, 283 F.3d at 723; Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 357 (5th Cir. 2001)) (emphasis added).  This "clearly better qualified" standard sets "a high bar" for plaintiff to meet.  Id. at 529.

Rowe's evidence fails to create a disputed fact issue that he was clearly better qualified than Lyncker or Matthews.  All three applicants were qualified for the job.  Although Rowe had more years of federal experience than Lyncker or Matthews, the evidence is undisputed that a candidate's years of experience was not a significant factor in Goeke's decision and that the key qualities he considered were leadership ability, a commitment to work and the demonstrated ability to do whatever was required to get the job done.  See Churchill, 539 F. App'x at 320 (affirming summary judgment for defendant when plaintiff had more years of experience and more formal education than successful job applicant, but successful candidate outperformed plaintiff on the job interview, which defendant cited as the most important criterion for the job, and the selecting official stated that years of experience and formal education were "not the best indicators of who will make the best training instructor" and that these qualifications "are 'of little consequence'"").  Goeke had supervised all three employees and knew their abilities, characters and work ethics. "One can hardly find mendacity by the employer when 'its judgments on qualifications are somewhere within the realm of reason.'"  Id.

41

at 321 (quoting <u>Deines v. Tex. Dep't of Protective & Regulatory Servs.</u>, 164 F.3d 277, 282 (5th Cir. 1999)).  Goeke's reasons fall within that realm.

Rowe cannot raise a material fact issue simply by disputing his employer's judgment of the applicants' qualifications.

> Even accepting that [plaintiff] had more supervisory experience and higher-level experience generally, an employer may discount both years of service and general experience in favor of specific qualifications. . . .  [O]ur precedents recognize that <u>employers</u> are generally free to weigh the qualifications of prospective employees, so long as they are not motivated by [a protected characteristic].

<u>Martinez v. Tex. Workforce Comm'n</u>, No. 14-50391, 2014 WL 7403572, at *2 (5th Cir. Dec. 30, 2014) (citing <u>Moss v. BMC Software, Inc.</u>, 610 F.3d 917, 923-24 (5th Cir. 2010)).

Nor can Rowe demonstrate a material fact issue simply by disputing the factual accuracy of Goeke's reasons.  Even if those reasons turned out to be wrong, an employer "is entitled to be unreasonable so long as it does not act with discriminatory animus." <u>Sandstad v. CB Richard Ellis, Inc.</u>, 309 F.3d 893, 899 (5th Cir. 2002).  "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason for" an adverse employment action.  <u>Bryant v. Compass Grp. USA Inc.</u>, 413 F.3d 471, 478 (5th Cir. 2005)) (quotation omitted).  "The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant

was not truly motivated by its proffered justification."  Little v. Republic Ref. Co., 924

F.2d 93, 97 (5th Cir. 1991) (citation omitted).

> Demonstrating that one is "clearly better qualified" is understandably very difficult to meet so as to avoid judicial second-guessing of business decisions; and it is well-established that better education, work experience, and/or longer tenure with the company does not necessarily make a candidate clearly better qualified.  Selecting [Matthews and Lyncker] over [Rowe] was well within the "realm of reason," and as discussed above, [Rowe] failed to raise a genuine issue of material fact that [defendant's] selection decision was motivated by discrimination.

Churchill, 539 F. App'x at 322 (citing Price, 283 F.3d at 723) (quoting Deines, 164 F.3d

at 282).

Rowe has produced only his own subjective belief, based solely on the fact that

his gender differs from that of the successful candidates, that the qualities that Goeke

articulated as the bases for selecting Lyncker and Matthews must have been a pretext for

discrimination.   The mere fact that plaintiff is a different gender than Lyncker and

Matthews is not enough to establish discriminatory animus.  Shaw v. Hardberger, No.

SA-06-CA-751-XR, 2007 WL 1174202, at *3 (W.D. Tex. Apr. 19, 2007) (citing Glass

v. Village of Sauk, No. 94-2782, 1996 WL 149342, at *2 (7th Cir. Mar. 28, 1996)).

Rowe's conclusion that his gender must have been the reason "is not competent evidence

that [gender] actually was a motivating factor in the hiring decision. . . .  Mere 'opinions,

with no supporting evidence' that a promotion decision was based on [gender] are

insufficient to support a claim of discrimination." Gregory, 574 F. App'x at 529 (quoting

Jenkins v. Methodist Hosps. of Dallas, Inc., 478 F.3d 255, 262 (5th Cir. 2007)).

Even though some of the hiring criteria were subjective, the court "must remain

cognizant that the ultimate issue is 'whether the employer's selection of a particular

applicant over the plaintiff was motivated by discrimination.'" Churchill, 539 F. App'x

at 320 (quoting Deines, 164 F.3d at 281); see Rubinstein v. Adm'rs of Tulane Educ.

Fund, 218 F.3d 392, 400 (5th Cir. 2000) (even though employee demonstrated some

evidence of pretext, there was "an overall lack of any evidence of discriminatory intent"

and employee's evidence of pretext was "not so persuasive so as to support an inference

that the real reason was discrimination").

Rowe has failed to produce any competent summary judgment evidence that

Goeke's selections were motivated by gender bias.  Accordingly, defendant is entitled

to summary judgment as a matter of law on plaintiff's discrimination claim.

B.     Plaintiff's Claim of a Retaliatory Hostile Work Environment

Rowe claims that Lyncker and Goeke subjected him to a retaliatory hostile work

environment beginning on August 13, 2012.  He alleges that the retaliatory actions

included Lyncker's accusation on that day that Rowe was checking up on her; Lyncker's

and Goeke's statements to him on October 3, 2012, that he was not pulling his weight or

being a team player; the denial of his request for leave on October 4, 2012; Lyncker's

order that he must work on Friday, October 5, 2012, which was his compressed day off,

and on Saturday; Lyncker's threat of a demotion; an unfair performance appraisal; and Lyncker's failure to respond to his e-mails requesting written documentation of the areas for improvement that she identified in his performance evaluation on October 31, 2012, so that he could appeal the evaluation.  The Bureau argues that plaintiff cannot establish a prima facie case of retaliatory hostile work environment because he has no evidence either to show that the allegedly harassing acts were based on retaliation or that they were severe or pervasive enough to alter his conditions of employment.

The Fifth Circuit has never recognized a cause of action under Title VII for a retaliatory hostile work environment.

> In the two instances in which it has been presented with this issue, the Fifth Circuit has declined to reach it, each time finding that the plaintiff failed to establish a prima facie case of retaliatory hostile work environment, even if such a claim were recognized.  In Bryan the court did note that "[a]t least the Second, Sixth, Seventh, Ninth, and Tenth Circuits have adopted this cause of action."

Tejada v. Travis Assoc. for the Blind, No. 1:12-CV-997-DAE, 2014 WL 2881450, at *3 (W.D. Tex. June 25, 2014), report & recommendation adopted, 2014 WL 4165370 (W.D. Tex. Aug. 7, 2014) (citing Fallon v. Potter, 277 F. App'x 422, 424 & n.3 (5th Cir. 2008); Bryan v. Chertoff, 217 F. App'x 289, 293 n.3 (5th Cir. 2007)); accord Griffin v. Tex. Dep't of State Health Servs., No. H-10-1673, 2011 WL 759476, at *4 n.22 (S.D. Tex. Feb. 14, 2011); Thomas v. City of Shreveport, No. 06-1078, 2008 WL 4291211, at *11 (W.D. La. Sept.15, 2008), aff'd sub nom Thomas v. Kent, 401 F. App'x at 864.

The Fifth Circuit in <u>Fallon</u> analyzed the plaintiff's prima facie case of retaliatory hostile work environment under the three-pronged retaliation standard, <u>Fallon</u>, 277 F. App'x at 425, while in <u>Bryan</u> the court applied the five-factor standard used in cases of race- or gender-based hostile work environment.  <u>Bryan</u>, 217 F. App'x at 293-94.  Some courts have stated that the Fifth Circuit did recognize a cause of action for retaliatory hostile work environment in <u>Williams v. Admin. Review Bd.</u>, 376 F.3d 471, 476-77 (5th Cir. 2004), which was <u>not</u> a Title VII case.  <u>E.g.</u>, <u>Gowski v. Peake</u>, 682 F.3d 1299, 1311 n.12 (11th Cir. 2012).  In my view, these decisions are erroneous, however, because the Fifth Circuit actually declined to decide the issue in <u>Williams</u>.  Instead, the court accepted the parties' assertion that a cause of action existed for employee claims of a hostile work environment in retaliation for whistle-blowing activities under the Energy Reorganization Act, 42 U.S.C. § 5851, <u>not</u> Title VII, and applied the Title VII hostile work environment standard to those claims.

In <u>Hiner</u>, a more recent case than <u>Fallon</u>, <u>Bryan</u> or <u>Williams</u>, plaintiff claimed that a hostile work environment had resulted from employment actions that he argued were <u>both</u> racially discriminatory and retaliatory.  Without mentioning whether a cause of action exists for a retaliatory hostile work environment, the Fifth Circuit analyzed the race-based claim under the hostile work environment standard and applied the retaliation standard to the retaliatory hostile work environment claim.  <u>Hiner</u>, 546 F. App'x at 407-08, 409.

The United States Supreme Court recently distinguished between Title VII's separate causes of action for a hostile work environment, which consists of harassment based on a person's protected status or characteristic (gender, in that case) and retaliation, which occurs because a person has engaged in protected activity.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006).  Thus, Title VII's

> antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.

Id.  Because the purposes of the two causes of action differ, they are analyzed under different standards.  Id. at 63-65.  Those well established standards are as follows.

> To make out a successful hostile work environment claim, the plaintiff must show that (1) he is a member of a protected group; (2) he was a victim of harassment; (3) the harassment was based on [a protected characteristic]; (4) the harassment affected a "term, condition or privilege" of his employment (i.e., the harassment was so pervasive or severe as to alter his conditions of employment and create an abusive working environment); and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.[5]

Hiner, 546 F. App'x at 407-08 (citing Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 651 (5th Cir. 2012)) (additional citations omitted).

---

[5] "'[W]here the harassment is allegedly committed by a supervisor with immediate or successively higher authority, the plaintiff employee needs to satisfy only the first four of the elements listed above.'" Parker v. La. Dep't of Special Educ., 323 F. App'x 321, 325 (5th Cir. 2009) (quoting Celestine, 266 F.3d at 353).

> In order to make out a prima facie case of unlawful retaliation under Title VII, the plaintiff must show that he (1) engaged in protected activity, (2) an adverse employment action occurred, and (3) there is a causal link between the protected activity and the adverse employment action. As with a discrete discrimination claim, the employer may rebut the plaintiff's prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff then has the burden of demonstrating pretext.

Id. at 409 (citing Long v. Eastfield Coll., 88 F.3d 300, 304-05 (5th Cir. 1996)). An adverse employment action occurs if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68.

Several "Circuit Courts of Appeals to consider the question . . . have also recognized . . . a cause of action for 'retaliatory harassment' or 'retaliatory hostile work environment.'" Scott v. City of Sioux City, No. C 13-4064-MWB, 2014 WL 7274929, at *10 (N.D. Iowa Dec. 22, 2014) (citing Gowski, 682 F.3d at 1312; Wiley v. Glassman, 511 F.3d 151 (D.C. Cir. 2007); Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007); Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006); Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005); Stutler v. Ill. Dep't of Corr., 263 F.3d 698, 703 (7th Cir. 2001); Ray v. Henderson, 217 F.3d 1234, 1245-46 (9th Cir. 2000); Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999); Gunnell v. Utah

<u>Valley State Coll.</u>, 152 F.3d 1253, 1265 (10th Cir. 1998); <u>Ross v. Commc'ns Satellite Corp.</u>, 759 F.2d 355, 366 (4th Cir. 1985)).

Given the lack of a definitive decision from the Fifth Circuit, this court will assume, as other district courts in this circuit have done, that Rowe has a cause of action for a retaliatory hostile work environment. The court will apply a modified form of the discriminatory hostile environment standard to this claim.

> In a claim involving an allegedly <u>retaliatory</u> hostile environment (as opposed to a <u>discriminatory</u> hostile environment), the first and third elements [of a prima facie case] have a different focus. In the retaliation context, the first element would require proof that the plaintiff had engaged in protected activity, and the third element would require demonstration of a causal connection between the harassment and the protected activity.

<u>Tejada</u>, 2014 WL 2881450, at *3.

A hostile work environment results from discrimination that does <u>not</u> culminate in a tangible or adverse employment action. <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 764-65 (1998). A hostile work environment

> "involves repeated conduct . . . [that] occurs over a series of days or perhaps years and . . . [where] a single act of harassment may not be actionable on its own," <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 . . . (2002), [while] a discrete-acts claim involves a single act of discrimination "such as termination, failure to promote, denial of transfer, or refusal to hire." <u>Id.</u> at 114 . . . "[A] plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard," <u>Baird v. Gotbaum</u>, 662 F.3d 1246, 1252 (D.C. Cir. 2011) . . . .

Brooks v. Grundmann, 748 F.3d 1273, 1278 (D.C. Cir. 2014); accord Gowski, 682 F.3d at 1312-13.

A hostile environment claim asserts "a series of separate acts that collectively constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp., 536 U.S. at 117. "A workplace environment is hostile when it is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Alaniz v. Zamora-Quezada, 591 F.3d 761, 771 (5th Cir. 2009) (quotation omitted). "In discerning severity and pervasiveness, we assess the timeline of events as a whole" to determine whether "each example of abusive conduct . . . add[s] materially to the alleged aura of hostility." Brooks, 748 F.3d at 1276 (citation omitted).

In recognizing a cause of action for a retaliatory hostile work environment, the First Circuit in Gowski equated the "severe or pervasive" element of the hostile work environment test with the "adverse employment action" prong of a prima facie case of retaliation: "the actions complained of were sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action." Gowski, 682 F.3d at 1312. The court also held that "but-for causation," which is the third, pretext element of a retaliation claim, still "matters in a retaliatory hostile work

environment claim–that is, the severe and pervasive[6] accumulation of actions that would not have occurred but-for the retaliatory reason, even if each action alone was justifiable." Id. at 1313.

Rowe engaged in protected activity when he contacted an EEO counselor on April 3, 2012, and filed his EEO complaint on May 15, 2012.  He amended his complaint to include retaliation and a hostile work environment on October 9 and filed a second complaint of retaliation on December 12, 2012.  The first prong of the hostile work environment standard test is therefore satisfied.

The evidence indicates that the EEO counselor contacted Goeke on April 10, 2012. Record Doc. No. 31-24 at p. 39.  Christopher learned of Rowe's informal complaint on April 17, 2012, when the EEO counselor interviewed him.  Record Doc. No. 31-17 at p. 12.  Goeke testified that he knew of plaintiff's first complaint sometime after it was filed.  Lyncker could not recall when she learned of the complaint, but said she may have known about it a couple of months after it was filed.  The court assumes without deciding that the temporal proximity of the dates when his supervisors learned of Rowe's EEO activity to the allegedly retaliatory acts satisfies the causal link prong of a prima facie case of retaliatory hostile work environment.  Roberts v. Lubrizol Corp., 582 F. App'x 455, 461 (5th Cir. 2014) (citing Feist v. La. Dep't of Justice, 730 F.3d 450, 454 (5th Cir.

---

[6]The Fifth Circuit has held that the correct standard is "severe or pervasive," not severe and pervasive, as the First Circuit stated in Gowski.  Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005).

2013)); <u>Tejada</u>, 2014 WL 2881450, at *4 (citing <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 562 (5th Cir. 2007).

However, plaintiff's evidence fails to create a material fact issue that the acts of which he complains were severe or pervasive enough to alter his conditions of employment and create an abusive working environment.

> For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive. To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. No single factor is determinative. In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite.

<u>Equal Emp't Opportunity Comm'n v. WC&M Enters., Inc.</u>, 496 F.3d 393, 399-400 (5th Cir. 2007) (citations omitted).

"Title VII . . . is not a 'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Lauderdale v. Tex. Dep't of Crim. Justice</u>, 512 F.3d 157, 163 (5th Cir. 2007) (quotation omitted). "Offensive and unprofessional behavior" alone does not violate Title VII. <u>Kummerle v. EMJ Corp.</u>, 538 F. App'x 373, 374 (5th Cir. 2013).

A supervisor's use of harsh language or yelling at a plaintiff and removing items from his work space are "trivial" actions that "cannot support a hostile work environment claim." <u>Bryan</u>, 217 F. App'x at 294.  Denial of a plaintiff's request for special duty and temporary changes to schedule and duty assignments do not amount to a hostile work environment.  <u>Hiner</u>, 546 F. App'x at 408; <u>Escalante v. Holder</u>, No. EP-09-CV-368-KC, 2011 WL 1528472, at *8 (W.D. Tex. Apr. 20, 2011) (citing <u>Ellis v. Principi</u>, 246 F. App'x 867, 871-72 (5th Cir. 2007); <u>McConathy v. Dr. Pepper/Seven-Up Corp.</u>, 131 F.3d 558, 563-64 (5th Cir. 1998)).  Careful monitoring of an employee's job performance, absent any other evidence of prohibited discrimination, does not suffice to support a claim for hostile work environment.  <u>Ellis</u>, 246 F. App'x at 871.

Disciplining an employee for performance issues, when consistent with the employer's policies, is not a hostile act.  <u>Tejada</u>, 2014 WL 2881450, at *5 (citing <u>Schroeder v. Greater New Orleans Fed. Credit Union</u>, 664 F.3d 1016, 1024 (5th Cir. 2011)); <u>see also</u> <u>DeHart v. Baker Hughes Oilfield Operations, Inc.</u>, 214 F. App'x 437, 442 (5th Cir. 2007) (no causal connection for retaliation when employer followed detailed policy in disciplining an employee and gave her several warnings to correct her missteps).  An internal investigation of a plaintiff's conduct is not sufficiently severe to alter a term, condition or privilege of employment.  <u>McGarry v. Univ. of Miss. Med. Ctr.</u>, 355 F. App'x 853, 858 (5th Cir. 2009) (citing <u>Shepherd v. Comptroller of Pub. Accounts</u>, 168 F.3d 871, 872-74 (5th Cir. 1999)).  In addition, "selective enforcement of a time and

attendance policy does not necessarily indicate conduct giving rise to a hostile work environment claim." <u>Brooks</u>, 748 F.3d at 1276 (citing <u>Bhatti v. Trs. of Boston Univ.</u>, 659 F.3d 64, 74 (1st Cir. 2011) "(concluding the selective enforcement of workplace rules and the failure to extend certain informal courtesies are part of conduct that is 'far from severe [and] never physically threatening')").

Rowe's "fully successful" "performance reviews also do little to evince abusive conditions–they were not uniformly negative and had some legitimate bases." <u>Id.</u> at 1276-77 (citing <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1201 (D.C. Cir. 2008) "(noting 'legitimate reasons and constructive criticism offered in . . . letters of counseling and reprimand' undercut allegations of a hostile work environment)").  Here, Lyncker's designations of "recommended areas of improvement [are] hardly the stuff of severe or pervasive workplace hostility." <u>Id.</u> at 1277 (citing <u>Darbha v. Capgemini Am. Inc.</u>, 492 F. App'x 644, 647 (7th Cir. 2012)).

Under these principles, in the totality of the circumstances, the cumulative actions of which Rowe complains are neither severe nor pervasive enough to have created a hostile work environment.  None of the alleged conduct by Lyncker and Goeke was physically threatening, humiliating or otherwise severe and, aside from Lyncker's monitoring of Rowe's performance and, as she put it, the "need to hold his hand" and give him regular "to do lists" to keep his project on schedule, none of the conduct amounted to more than isolated incidents.

54

> The [Bureau's] conduct toward [Rowe] was far from severe, never physically threatening, generally conducted in private so as not to be humiliating, and never overtly offensive; moreover, [Rowe] has pointed to no effect whatsoever on [his] work performance. True, [he] sought psychological counseling, but this is evidence of subjective offense at best.

Bhatti, 659 F.3d at 74.

The oral statements by Lyncker and Goeke regarding their expectations for Rowe's performance and their orders that he must work on days when his team members were working to meet an imminent, critical deadline were well within the acceptable, indeed, the expected, duties of supervisors and the Bureau's routine policies. Neither the oral statements nor Lyncker's failure to provide plaintiff with a written list of areas of improvement had any deleterious effect on plaintiff's employment. The list that he requested was not necessary for him to be able to appeal his performance evaluation. The list was read to him verbatim at his evaluation on October 31, 2012, and he took notes. Lyncker told him repeatedly that she would give him a written list when she found the time to type it. Her testimony that she was extremely busy with work in November 2012 is undisputed. Rowe was aware of the appeal process policy and could have instituted a formal appeal based on his written performance appraisal and his notes and memory of the oral discussion, after the seven-calendar-day deadline for an informal reconsideration had passed. He failed to do so.

To the extent that Lyncker snapped at Rowe on August 13, 2012, when he alleges that she "accused" him of checking up on her,[7] her outburst "may have been tactless and ill-mannered" but "[t]he incident, at its worst, was an isolated expression of frustration. That alone cannot rise to the level of severity indicating hostility or abuse." Brooks, 748 F.3d at 1277 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Rowe's most serious allegation, that he was "threatened" with a demotion, is not supported by the competent evidence. Christopher, Goeke and Lyncker all testified that a policy discussion occurred at the managerial level, which was not targeted at plaintiff, but which arose out of his work performance issues, and that they never threatened him with a demotion. Rowe testified that, when Lyncker advised him during his evaluation that Rodi had questioned whether he should be a GS-12, she specifically told him that it was not a threat, although he decided to take it as one. He received a fully successful rating and did not receive either of the two possible lower ratings (minimally successful and unsatisfactory). No manager ever took any steps to demote him, which he testified would be a lengthy process that presumably would have required that he receive a rating lower than fully successful. Even if such a threat were made during his evaluation,

---

[7]Lyncker denied that she "accused" Rowe of checking up on her. She testified that, after she arrived in the office that morning, she told him that she was there and that he could write it down if he wanted. She had been told that he had been seen checking her time sheets. Lyncker deposition, Record Doc. No. 31-5 at pp. 57-58.

however, the evidence is undisputed that the evaluation was based on his supervisors' observations of his work performance over the past seven months.

Rowe has produced only his own subjective, speculative belief that the so-called threat was retaliatory, which is insufficient to establish a material fact issue. Mitchell v. Snow, 326 F. App'x 852, 857 (5th Cir. 2009) (citing Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996)). As a matter of law, reprimands and isolated comments do not rise to the level necessary to support a cause of action for retaliatory hostile work environment. Aristyld v. City of Lauderhill, 543 F. App'x 905, 909 (11th Cir. 2013). Without more, this single statement by Lyncker does not amount to severe or pervasive harassment. "Indeed, [Rowe] himself was undeterred by [the threat]: a few months later he filed an EEO complaint alleging [additional retaliation], an act which had no repercussions on his employment status." Muttathottil v. Gordon H. Mansfield, 381 F. App'x 454, 458 (5th Cir. 2010).

Although he fails to argue it in his memorandum (and therefore he should be deemed to have abandoned the claim), Rowe contends in his amended statement of undisputed facts that he was subjected to retaliatory ostracism by managers Tom Bjerstedt, Greg Kozlowski and Terri Thomas in January 2013 when the managers allegedly told employees Perry Boudreaux and Annette Willeman that "associating with Casey Rowe could affect their promotion potential and lateral movement." Record Doc. No. 52 at p. 15.

First, there is no evidence that these three managers knew that Rowe had filed an EEO complaint.  Bjerstedt denied such knowledge.  Bjerstedt affidavit, Record Doc. No. 40-3 at p. 18.  In the absence of knowledge of plaintiff's protected activity, the managers could not have engaged in retaliation.  Balakrishnan v. Bd. of Supervisors, 452 F. App'x 495, 500 (5th Cir. 2011) (citing Watts v. Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999)).

In addition, according to plaintiff's amended statement of facts at paragraphs 67-73 and the competent evidence, it is uncontested that none of these managers ever told Boudreaux or Willeman that they should avoid Rowe.  The evidence is undisputed that the managers never mentioned his name in their oral or written communications with the two employees and that the goal of the conversations was to mentor younger employees and to caution them about taking excessively long breaks.  Bjerstedt affidavit, Record Doc. No. 40-3 at pp. 9-14, 15-17; Defendant's Exh. 3, Obiol declaration, Record Doc. No. 37-5 at ¶¶ 9-10; Defendant's Exh. 10, Thomas declaration, Record Doc. No. 37-34 at ¶¶ 2-4; Christopher deposition, Record Doc. No. 31-6 at pp. 31-34.  Rowe's assumption that the communications must have been about him and should be interpreted as directions to avoid him is unsupported by the evidence.

Rowe never was shut out from his work and never had his privileges revoked or his duties eliminated. Far from creating a material fact issue that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

58

severe or pervasive to alter the conditions of [his] employment," Alaniz, 591 F.3d at 771

(quotation omitted),

> [t]he facts underlying [Rowe's] claims seem more like the "ordinary
> tribulations of the workplace," a series of "petty insults, vindictive
> behavior, and angry recriminations" that are not actionable under Title VII.
> Considered in the aggregate, the episodes cited by [plaintiff] do not
> sufficiently demonstrate the sort of severity or pervasiveness needed to
> prove a hostile work environment.

Brooks, 748 F.3d at 1277-78 (quoting Faragher, 524 U.S. at 788; Bhatti, 659 F.3d at 74).

Accordingly, defendant is entitled to summary judgment as a matter of law on

plaintiff's retaliatory hostile work environment claim.

C.    Plaintiff's Retaliation Claim

Rowe alleges that the following actions were retaliatory:  his leave request for

October 4, 2012, was denied; he was ordered to work unnecessarily on his compressed

day off (October 5, 2012); he was given a "fully successful" performance rating on

October 31, 2012, for the preceding 12 months, rather than the one "exceptional" and

other consistently "superior" ratings that he received from Goeke for fiscal years 2007

through 2011, Record Doc. Nos. 31-30 at pp. 1-37 and 31-27 at pp. 9-15; and he was

unable to go through the appraisal reconsideration process because Lyncker failed to

respond to his request for a written list of his performance deficiencies.  The Bureau

argues that plaintiff has no evidence to establish the third, causal link prong of a prima

facie case.  Alternatively, if he can demonstrate a prima facie case, defendant contends

that it had legitimate, non-retaliatory reasons for its actions and that Rowe has no evidence to create a fact issue that its reasons were merely a pretext and that retaliation was the but-for cause of defendant's actions.  However, the court finds that defendant is entitled to summary judgment on this claim because none of the actions of which Rowe complains was a retaliatory adverse employment action, as a matter of law, and he therefore cannot establish a triable fact issue as to the second prong of a prima facie case.

> To establish a prima facie case of retaliation under Title VII, a plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action.

Coleman v. Jason Pharm., 540 F. App'x 302, 303 (5th Cir. 2013) (quotation omitted). "[A]n adverse employment action is an action that is 'materially adverse' that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Thibodeaux-Woody v. Houston Cmty. Coll., No. 13-20738, 2014 WL 6064479, at *4 (5th Cir. Nov. 14, 2014) (quoting Burlington N., 548 U.S. at 68 (2006)).

"A less than optimal performance review, without more, is not something that would have discouraged [plaintiff] from asserting a charge of discrimination." Id. at *5 (citing Baloch, 550 F.3d at 1199) "('[P]erformance reviews typically constitute adverse actions only when attached to financial harms.')"; accord Mitchell, 326 F. App'x at 856.

There is no evidence that Rowe's "fully successful" rating had any negative consequences on his existing position, duties or salary.  Lyncker gave him a list of ways

that he could improve his performance.  The only financial harm that he asserts is a <u>possible</u> negative effect on his ability to obtain future promotions.  This type of speculative harm is insufficient to establish an adverse employment action.

Denial of a request for vacation leave and the opportunity to work by telephone are not materially adverse and would not dissuade a reasonable employee from making or sustaining an allegation of discrimination.  Lara v. Kempthorne, 673 F. Supp. 2d 504, 518-19 (S.D. Tex. 2009) (citing Burlington N., 548 U.S. at 63; Stewart, 586 F.3d at 331-32; Mitchell, 326 F. App'x at 856; Browning, 288 F. App'x at 179).  Indeed, Rowe filed an amended EEO charge on October 9, 2012, after the denial of his leave request, and another EEO charge on December 12, 2012, as a result of his performance evaluation, so he was not dissuaded from complaining about the alleged retaliation.

Finally, Lyncker's neglect to provide Rowe with a written list of his performance deficiencies was not materially adverse because the evidence is undisputed that he did not need the list in order to initiate the formal appraisal reconsideration process.  Accordingly, defendant is entitled to summary judgment in its favor as a matter of law on plaintiff's retaliation claims.

<u>CONCLUSION</u>

None of the issues, problems or personal frustrations about which Rowe complains in this case rise to the level of discrimination on the basis of his gender, retaliation for engaging in protected activities or creation of an actionable hostile work environment. What happened to Rowe in this work environment is the practical equivalent of nothing prohibited by any aspect of Title VII and instead constitutes only the routine kinds of non-discriminatory disappointments and frictions occurring commonly in workplace settings in which human beings come in contact with each other. For all of the foregoing reasons, **IT IS ORDERED** that defendant's motion for summary judgment is GRANTED, plaintiff's motion for summary judgment is DENIED and plaintiff's claims are DISMISSED WITH PREJUDICE. Judgment will be entered accordingly, plaintiff to bear all costs of this proceeding. Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this \_\_\_\_13th\_\_\_\_ day of February, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE